```
              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF TEXAS
                        DALLAS DIVISION

GRYPHON MASTER FUND, L.P.,      §
et al.,                         §
                                §
                   Plaintiffs,  §
                                § Civil Action No. 3:06-CV-0107-D
VS.                             §
                                §
PATH 1 NETWORK TECHNOLOGIES,    §
INC.,                           §
                                §
                   Defendant.   §
```

MEMORANDUM OPINION

Plaintiffs Gryphon Master Fund, L.P. and GSSF Master Fund, LP (collectively, "Gryphon") apply for a preliminary injunction to prohibit defendant Path 1 Network Technologies, Inc. ("Path 1") from transferring any of its assets to a third party. For the reasons that follow,[1] the court grants the application.[2]

I

In early 2005, Gryphon and Path 1 entered into a Securities Purchase Agreement ("Agreement") under which Gryphon acquired 461,538 shares of preferred Path 1 Stock. The Certificate of Designations ("Certificate") that governs Path 1's preferred shares imposes the following restriction on borrowing in ¶ 10(iii):

---

[1]Gryphon's preliminary injunction application is before the court under the procedure permitted by Fed. R. Civ. P. 43(e) and is being decided on the papers, without an evidentiary hearing. *See, e.g., Jones v. Bush*, 122 F.Supp.2d 713, 715 (N.D. Tex.) (Fitzwater, J.), *aff'd*, 244 F.3d 134 (5th Cir. 2000) (per curiam) (unpublished table decision).

[2]As permitted by Rule 52(a), the court sets out its findings of fact and conclusions of law in this memorandum opinion.

> So long as any [designated shares] remain outstanding, [Path 1] shall not, without the vote or written consent by the holders of at least 51% of the then outstanding shares of the [designated shares], voting together as a single class . . . [a]uthorize or issue, or obligate itself to authorize or issue, any debt security, or otherwise incur indebtedness for borrowed money[.]

Ps. App. 73. Gryphon's 416,538 shares of preferred stock amount to 53.4% of the total designated shares. Accordingly, ¶ 10(iii) requires Path 1 to obtain Gryphon's consent before it may incur indebtedness.

Paragraph 10(iii) carves out three exceptions to the general prohibition against borrowing without consent. Under ¶ 10(iii), Path 1 may incur liability for borrowed money, without Gryphon's consent,

> (A) to a strategic investor in connection with a strategic commercial agreement or transaction as determined by the Independent Directors,
>
> (B) *pursuant to a commercial borrowing, secured lending or lease financing transaction approved by the Independent Directors*, or
>
> (C) pursuant to the acquisition of another corporation or entity by [Path 1] by consolidation, merger, purchase of all or substantially all of the assets, or other reorganization.

P. App. 73 (emphasis added). Paragraph 10(iii)(B) is the exception at issue in this case.

In December 2005 Path 1 entered into a debt financing agreement with Laurus Master Fund Ltd. ("Laurus"), under which Path

1 issued to Laurus a secured convertible term note and a common stock purchase warrant. Although Path 1 initially sought Gryphon's consent to the transaction, Path 1 eventually closed it without Gryphon's approval. After learning of the transaction, Gryphon notified Path 1 that it had violated Gryphon's consent rights under ¶ 10(iii) of the Certificate, and it filed this lawsuit.

During the pendency of this suit, Path 1 entered into a second transaction with Laurus, incurring an additional $1 million in debt. Once again, Path 1 did not seek or obtain Gryphon's consent before consummating the transaction. Together, the transactions with Laurus have resulted in $3.1 million in debt obligations that Path 1 has secured with substantially all of its assets.

Gryphon alleges that the preferred shareholders, including Gryphon, have a liquidation preference of $3 million. If Path 1 is liquidated, however, Laurus, as a secured debt holder, would be paid before preferred shareholders receive their $3 million liquidation preference.

Since January 1, 2007 Path 1 has been in default on its debt obligations to Laurus. Path 1 is currently almost two months late in filing its Form 10-K for 2006. In April it issued a "Notification of Late Filing," citing as the reason for its inability to file "a lack of current funds to pay the necessary legal, accounting and other fees and expenses associated with the preparation and filing of the Form 10-K." Ps. App. 278. Because

of its failure to remain current with its regulatory filings, Path 1 was recently delisted from the OTC Bulletin Board.

On May 8, 2007 Path 1 filed a Form 8-K, announcing that it had entered into an agreement with Laurus and IP Video Networks, Inc. ("IPVN"), a company created on April 19, 2007 and owned by two Path 1 employees. Under the terms of the transaction, Laurus will acquire Path 1's assets and convey them to IPVN in exchange for a 27% interest in IPVN. Gryphon maintains that the recently-formed IPVN will essentially operate as Path 1 without the burden of Path 1's contractual obligations in this lawsuit.

On May 11, 2007 Gryphon filed a supplemental application for a temporary restraining order ("TRO"),[3] seeking a TRO prohibiting Path 1 from entering into any agreement with Laurus or any other entity for the transfer of substantially all of its assets. The court granted a TRO on May 16, 2007 and subsequently extended the TRO through June 14, 2007. Gryphon applies for a preliminary injunction prohibiting Path 1 from transferring any of its assets to any third party.

II

"A preliminary injunction 'is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by

---

[3]This motion supplemented Gryphon's April 2, 2007 application for a TRO and temporary injunction, which the court denied on April 9, 2007. The circumstances that resulted in the court's earlier orders denying Gryphon's TRO applications have materially changed.

- 4 -

a clear showing, carries the burden of persuasion.'" *Jones v. Bush*, 122 F.Supp.2d 713, 718 (N.D. Tex.) (Fitzwater, J.) (quoting *White v. Carlucci,* 862 F.2d 1209, 1211 (5th Cir. 1989)), *aff'd,* 948 F.2d 1286 (5th Cir. 1991) (per curiam) (unpublished table decision)), *aff'd,* 244 F.3d 134 (5th Cir. 2000) (per curiam) (unpublished table decision). "The decision to grant a preliminary injunction is to be treated as the exception rather than the rule." *Miss. Power & Light Co. v. United Gas Pipe Line Co.,* 760 F.2d 618, 621 (5th Cir. 1985) (stating that movant must "clearly carr[y] the burden of persuasion"). To obtain a preliminary injunction, Gryphon must establish (1) a substantial likelihood that it will prevail on the merits, (2) a substantial threat that it will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to it outweighs the threatened harm the injunction may do to defendant, and (4) that granting the preliminary injunction will not disserve the public interest. *See Jones*, 122 F.Supp.2d at 718.

### III

The court considers first whether Gryphon has established a substantial likelihood that it will prevail on the merits of its breach of contract claim.

#### A

Gryphon contends that Path 1's transactions with Laurus violate ¶ 10(iii) of the Certificate, as interpreted under Delaware

law. It argues that ¶ 10(iii) requires Gryphon's consent for Path 1 to issue any debt security or incur indebtedness, except as allowed by carve-outs (A) through (C). Gryphon posits that carve-outs (A) and (C) are facially inapplicable to the Laurus transactions. Thus for the Laurus transactions to be permissible, carve-out (B) must apply.

Carve-out (B) provides that Path 1 may incur debt without the consent of Gryphon "pursuant to a commercial borrowing, secured lending or lease financing transaction approved by the Independent Directors." Ps. App. 73. Gryphon argues that carve-out (B) does not apply to the Laurus transactions because the industry meaning of "commercial" is a transaction with a traditional bank or financial institution. In the Laurus transactions, Laurus gained a secured lending position and acquired equity opportunities through the conversion of its notes and exercise of its warrants. Gryphon argues that this type of federally-regulated securities transaction bears a greater resemblance to investment banking than to commercial lending. Thus it posits that because Laurus is not a bank, and because the transactions with Laurus were hybrid debt/equity transactions that bear no resemblance to the typical commercial debt transaction, the Laurus transactions do not fall within the scope of carve-out (B).

Gryphon next argues that Path 1's interpretation of carve-out (B)—that the term "commercial" modifies only "borrowing" and not

"secured lending" and "lease financing transaction"—renders the prohibition against borrowing meaningless and fails to give effect to all provisions in the Certificate. It maintains that if "commercial" does not modify "secured lending," carve-out (B) would authorize *any* secured lending transaction, permitting Path 1 to incur any debt so long as it is "secured" by Path 1's assets. Gryphon reasons that it makes no sense for ¶ 10(iii) to prohibit borrowing generally, but then to allow any borrowing that is secured by Path 1's assets. It posits that only the interpretation that the word "commercial" modifies (1) borrowing, (2) secured lending, and (3) lease financing is likely to prevail, because this is the only construction that does not render meaningless the general prohibition on non-consensual borrowing. And Gryphon posits that its interpretation makes sense because it would prohibit hybrid debt/equity transactions, like the ones Path 1 entered into with Laurus, that tend to be burdensome and costly to the borrower and that present the potential for dilution of the preferred shareholders' holdings. Gryphon maintains that these reasons caused it to include in the Certificate provisions that protect it against Laurus-type transactions, while still allowing less burdensome loans by traditional banks.

Path 1 responds that the word "commercial" does not modify "secured lending" or "lease financing transaction." It reasons that because the transactions with Laurus should be categorized as

secured lending, there was no need to obtain Gryphon's consent under ¶ 10(iii)(B).  Path 1 points to various emails and conversations in which it made its position clear that it did not need Gryphon's consent to close the first Laurus transaction.  It maintains that Gryphon was aware that the contractual language was ambiguous, because Gryphon modified language similar to that at issue in ¶ 10(iii) when it entered into similar contracts with other companies.

B

The court concludes that Gryphon has met its burden of establishing a substantial likelihood of success on the merits of its claim.

"Under general principles of [Delaware] contract law, a contract should be interpreted in such a way as to not render any of its provisions illusory or meaningless." *Sonitrol Holding Co. v. Marceau Investissements*, 607 A.2d 1177, 1183 (Del. 1992) (citing *Seabreak Homeowners Ass'n, Inc. v. Gresser*, 517 A.2d 263, 269 (Del. Ch. 1986), *aff'd* 538 A.2d 1113 (Del. Supr. 1988)).  Furthermore, exceptions should not be construed so broadly that the rule is swallowed by the exception.  *GTE Corp. v. Allendale Mut. Ins. Co.*, 372 F.3d 598, 614 (3d Cir. 2004) ("the 'exception to [the] . . . exclusion cannot be construed so broadly that the rule (the exclusion) is swallowed by the exception.'" (quoting *Swire Pac. Holdings, Inc. v. Zurich Ins. Co.*, 139 F.Supp.2d 1374, 1381 (S.D.

Fla. 2001))). Path 1's interpretation of ¶ 10(iii)(B) significantly undermines, if it does not swallow up, the general prohibition on borrowing found in ¶ 10(iii). Paragraph 10(iii) broadly prohibits Path 1 from borrowing without shareholder consent. Paragraph 10(iii)(B) contains three categories of exceptions to the prohibition. If the word "commercial" in ¶ 10(iii)(B) is interpreted to modify only the term "borrowing"—meaning that Path 1 did not need shareholder consent to obtain a secured loan—the general prohibition on non-commercial borrowing found in ¶ 10(iii) would be inapplicable to all secured loans, not merely to non-commercial secured loans. While such a restriction on borrowing would indirectly benefit non-commercial lenders by forcing Path 1 to obtain secured financing if it wanted to do so without shareholder approval, it would not conform to the objectively discernible intent of ¶ 10(iii) of protecting shareholders such as Gryphon from vetoing loans of a type (hybrid debt/equity transactions) that could dilute their ownership interest in Path 1. Allowing non-commercial secured lending would largely swallow up the general prohibition against unapproved borrowing.

When the term "commercial" in ¶ 10(iii)(B) is interpreted to apply to a secured loan with, say, a traditional bank, the exception on borrowing found in ¶ 10(iii)(B) does not effectively swallow the prohibition found in ¶ 10(iii). It simply means that

although borrowing without shareholder approval is generally prohibited, certain types of borrowing, including secured loans from a traditional bank that do not normally come with terms that can dilute shareholder equity, do not need approval.

Gryphon has met its burden of establishing a substantial likelihood that it will succeed on the merits of its breach of contract claim because its interpretation of ¶ 10(iii)(B) is correct, and that Path 1 was obligated to obtain Gryphon's consent before consummating the transactions with Laurus.

IV

The court must decide next whether Gryphon has established that there is a substantial threat that it will suffer irreparable injury if the injunction is not granted.

Gryphon has demonstrated that Path 1 has defaulted on its obligations to Laurus, and that its $3.1 million indebtedness to Laurus is secured by substantially all of its assets. If the court does not enjoin Path 1 from transferring its assets, Gryphon will have no chance of collecting a judgment from Path 1, because Path 1 intends to convey all of its assets to Laurus in satisfaction of its debt obligations.

Gryphon has met its burden of establishing a substantial threat that it will suffer irreparable injury if the injunction is

not granted.[4]  In *Lometa Bancshares, Inc. v. Potts*, 952 S.W.2d 631 (Tex. App. 1997, no pet.), a Texas court of appeals upheld an injunction requiring the defendant to deposit into the court registry the proceeds from a contested sale of company stock, so that the funds would be available to satisfy the judgment if plaintiffs were successful at trial.  *Id.* at 632-33.  The court explained that the "adequacy of an available legal remedy must be judged in the circumstances of the particular case," and it stated that "any legal remedy by way of a judgment for money damages is properly viewed as inadequate on the ground that the funds may be reduced pending final hearing and thus be unavailable in their entirety for the purpose for which they were delivered to [defendant] in the first place."  *Id.* at 633.  The Texas Supreme Court has noted that "circumstances can arise in which a temporary injunction is appropriate to preserve the status quo pending an award of damages at trial."  *Walling v. Metcalfe,* 863 S.W.2d 56, 58 (Tex. 1993) (per curiam).  In *Walling* the court cited *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 386 (7th Cir. 1984), for examples of situations in which damages alone do not provide an adequate remedy at law.  *Walling,* 863 S.W.2d at 58.

---

[4]Both parties cite Texas law in addressing the question of substantial threat of irreparable injury.  The court need not decide at this time whether Delaware law—which is cited for principles of contract interpretation—controls this question instead of Texas law.

In *Roland* the Seventh Circuit stated that there can be an absence of an adequate remedy at law when "[d]amages may be unobtainable from the defendant because he may become insolvent before a final judgment can be entered and collected." *Roland*, 749 F.2d at 386.

The *Lometa Bancshares* court cited several cases to support the premise that the circumstances of that case showed that "any legal remedy by way of a judgment for money damages is properly viewed as inadequate on the ground that the funds may be reduced pending final hearing and thus be unavailable in their entirety for the purpose for which they were delivered to [defendant] in the first place." *Lometa Bancshares*, 952 S.W.2d at 633; *see Minexa Ariz., Inc. v. Staubach*, 667 S.W.2d 563, 567-68 (Tex. App. 1984, no writ) (upholding grant of preliminary injunction to prevent defendants from improperly dissipating specific funds that would otherwise be available to pay a judgment); *Sonics Int'l, Inc. v. Dorchester Enters., Inc.*, 593 S.W.2d 390, 393 (Tex. Civ. App. 1980, no writ) (upholding grant of temporary injunction that would restrain defendant from entering into contract that would obligate defendant to pay out more than $50,000 in fees because of effect that payment of fees was likely to have on financial stability of defendant); *Baucum v. Texam Oil Corp.*, 423 S.W.2d 434, 442 (Tex. Civ. App. 1967, writ ref'd n.r.e.) (upholding temporary injunction restraining defendant from disposing of a number of different kinds of assets and properties in order to maintain status quo, and

explaining that "the mere fact that there exists a remedy at law is not conclusive, but the remedy at law must be complete, practical and efficient, and subject to prompt administration.  This means, of course, that equity will step in with its injunctive processes where the remedy at law may not be sufficient or effective").

In its response, Path 1 points to *Lane v. Baker*, 601 S.W.2d 143, 145 (Tex. Civ. App. 1980, no writ), arguing that Texas courts have refused to uphold injunctions that prevent the sale of assets when the injunction does not preserve the status quo of the subject matter.  In *Lane* the same court of appeals that later decided *Lometa Bancshares* held that because the plaintiff's cause of action was independent of, and had no relation to, either defendant's assets (five as-yet-unsold condominium units), to enjoin the sale of the assets would be analogous to a prejudgment attachment. *Id.* at 145.  In the instant case, unlike in *Lane*, the transaction plaintiffs are seeking to enjoin is directly related to the transaction that is the basis of the lawsuit. Gryphon alleges that Path 1 breached the Certificate by incurring debt to Laurus, and that the damages it has suffered arise from the priority that Laurus now enjoys with regard to Path 1's assets.  The sale of assets to Laurus and consummation of the Laurus-IPVN transaction will relieve Path 1 of the debt it incurred through the putative breach of its contract with Gryphon.  Thus, unlike *Lane*, where plaintiffs sought to enjoin the sale of unrelated assets, here, the

proposed transaction with Laurus is intimately related to Gryphon's cause of action.

Gryphon has met its burden of establishing that absent a preliminary injunction, there is a substantial threat that it will suffer irreparable injury.

V

The court now examines whether Gryphon has shown that the threatened injury to it outweighs the threatened harm the injunction may do to Path 1.

Gryphon argues that Path 1 will not be harmed at all by the preliminary injunction. Path 1 has publicly declared that it is going out of business, it is over two months late in filing its Form 10-K, and its stock is barely trading on the Pink Sheets. Gryphon thus argues that, because Path 1 has nothing left to salvage, it cannot possibly be harmed by a preliminary injunction.

Path 1 responds that it will lose the benefit of a peaceful possession with Laurus if the court grants the injunction. It points out that Gryphon is seeking to enjoin not only Path 1, but also a third party (Laurus) from obtaining any benefit from an asset sale transaction, and that Gryphon is seeking to prevent anyone except itself from obtaining a benefit. Path 1 maintains that even if the injunction is granted, Laurus could still seize Path 1's assets by judicially foreclosing without Path 1's cooperation, but Path 1 would be denied the benefit of the

negotiated peaceful possession and asset sale deal with Laurus, including forgiveness of approximately $3.4 million in debt and a release of approximately $1.5 million in unsecured liabilities. Path 1 contends that if the preliminary injunction application is denied and the IPVN deal is consummated, the Path 1 corporate shell will retain value because of the possibility of selling the shell to a third party who desires to go public via a reverse triangular merger.  Path 1 asserts that the value of a clean shell has been estimated to be from $500,000 to $800,000 or an equity share in the new assets, as long as the company continues to trade on the Bulletin Board, and between $175,000 and $300,000 if the company falls from the Bulletin Board to the Pink Sheets.  Path 1 posits that, either way, the value or proceeds of the shell will redound to the shareholders, including Gryphon.

    Gryphon has shown that the threatened injury to it outweighs the threatened harm the injunction may do to Path 1.  If the court denies the preliminary injunction, it is a virtual certainty that Gryphon will not be able to recover any of its damages.  Although denying the injunction will enable Path 1 to consummate the transaction with Laurus and wipe out its indebtedness to Laurus, Path 1 is likely to be liable to Gryphon for at least $1.5 million. Even under Path 1's most optimistic assessment of the value of Path 1 as a shell corporation, its liability to Gryphon would still exceed its worth as a shell.

If the court grants the preliminary injunction, however, Gryphon will have a chance of recovering from Path 1. While Path 1 will not be able to wipe out its debt to Laurus, it will be insolvent even absent an injunction. In other words, Path 1's insolvent financial condition will exist under either scenario, but if the court grants an injunction, Gryphon has a chance of recovering on its claim. Gryphon has therefore shown that the threatened injury to Gryphon of not granting a preliminary injunction outweighs the threatened harm that the injunction may do to Path 1.

## VI

Neither party argues that the preliminary injunction will disserve the public interest,[5] and the court finds that it will not.

## VII

Path 1 maintains that if the court grants a preliminary injunction, it should increase the bond from the present amount ($50,000 at the time the TRO was entered) to $3.4 million. Path 1 argues that it faces potential harm that includes the loss of debt

---

[5] Path 1 asserted in opposition to Gryphon's TRO application that granting a TRO would disserve the public interest because it would not prevent Laurus from foreclosing on Path 1's assets, and granting an injunction would allow Gryphon to create the rule that an injunction can be obtained merely where a party cannot collect a future, uncertain judgment. The court rejects these grounds to the extent Path 1 intends that they apply to Gryphon's preliminary injunction application.

forgiveness of approximately $3.4 million and a release of approximately $1.5 million in unsecured liabilities, as well as the value of the Path 1 shell (without liabilities and lawsuit) of between $500,000 and $800,000.

Fed. R. Civ. P. 65(c) provides that "[n]o . . . preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." "[T]he amount of security required pursuant to Rule 65(c) 'is a matter for the discretion of the trial court." *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) (quoting *Corrigan Dispatch Co. v. Casa Guzman*, 569 F.2d 300, 303 (5th Cir. 1978)).

Because Path 1 would be insolvent under either scenario, the court is not persuaded on the present record that the damages it might incur or suffer if wrongfully enjoined are equal to $3.4 million. In other words, if it would be insolvent and unable to respond in damages either way, the fact that it would be insolvent to a lesser degree if allowed to consummate the Laurus-IPVN transaction cannot be quantified as $3.4 million damages. The party who apparently would be harmed by the preliminary injunction is Laurus, who stands to recover some of its indebtedness and to obtain an equity position in IPVN. But Laurus is not being enjoined and is not entitled to security under Rule 65(c).

The court will therefore leave in place the bond of $50,000 that Gryphon posted to obtain the TRO. If Path 1 can show that the bond should be increased to some amount less than $3.4 million, it may move separately for that relief. *See Olan Mills, Inc. v. Eckerd Drug of Tex., Inc.*, 1988 WL 161314, at *3 (N.D. Tex. Dec. 14, 1988) (Fitzwater, J.) ("Either party may move the court in writing to increase or decrease the bond for good cause shown.").

\*   \*   \*

For the foregoing reasons, the court grants Gryphon's application for a preliminary injunction. A preliminary injunction order is being filed today.

June 14, 2007.

_____
SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE